BETSY C. MANIFOLD (182450)
RACHELE R. BYRD (190634)
ALEX J. TRAMONTANO (276666)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Counsel for Plaintiff Jonathan Allen*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE CARIBOU BIOSCIENCES, INC. DERIVATIVE LITIGATION<br><br>This Document Relates to:<br>ALL ACTIONS | Lead Case No. 4:25-cv-02199-HSG (Consolidated)<br><br>**VERIFIED AMENDED CONSOLIDATED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## INTRODUCTION

Plaintiffs Alan Moisio and Jonathan Allen ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of nominal defendant Caribou Biosciences, Inc. ("Caribou" or the "Company"), file this Verified Amended Consolidated Shareholder Derivative Complaint against defendants Rachel Haurwitz ("Haurwitz"), Jason V. O'Byrne ("O'Byrne"), Scott Braunstein ("Braunstein"), Andrew Guggenhime ("Guggenhime"), David Johnson ("Johnson"), Dara Richardson-Heron ("Richardson-Heron"), Natalie Sacks ("Sacks"), Nancy Whiting ("Whiting"), and Ran Zheng ("Zheng") (collectively, the "Individual Defendants," and together with Caribou, "Defendants") for breaches of their fiduciary duties as directors and/or officers of Caribou, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Haurwitz and O'Byrne for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' amended consolidated complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Caribou, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from July 23, 2021 through July 16, 2024, both dates inclusive (the "Relevant Period").

2. Caribou is a medical testing company that develops genome-edited allogeneic, or "off-the-shelf," cell therapies to treat hematologic malignancies both globally and domestically. Caribou applies its CRISPR platform, called "chRDNA," to develop these genome edited cell therapies.

3. Allogeneic cell therapies are considered "off-the-shelf" because they use cells that had previously been collected from a donor before being modified, multiplied, and stored in a facility prior to being fused into a patient. The Company claims that these characteristics grant allogeneic cell therapies significant advantages as opposed to their autologous counterparts, which rely on extracting, modifying, and multiplying a patient's own cells before being infused back into that same patient.

4. Among the therapies in the Company's research and development pipeline are its allogeneic cell therapies such as its chimeric antigen receptor ("CAR") -T ("CAR-T") cell and CAR-natural killer ("CAR-NK") cell platforms. The Company's lead product candidate is CB-010, which is an allogeneic anti-CD19 CAR-T cell therapy that is being evaluated for use in patients with relapsed or refractory B cell non-Hodgkin Lymphoma ("r/r B-NHL") through the Company's ANTLER Phase 1 clinical trial, focusing on second-line large B cell lymphoma ("LBCL").

5. On July 1, 2021, the Company filed a registration statement on Form S-1 with the SEC (the "Registration Statement"), in connection with its initial public offering (the "IPO") conducted on or about July 23, 2021. On July 23, 2021, the Company filed a prospectus on Form 424B4 with the SEC in connection with the IPO which incorporated and formed part of the Registration Statement (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

6. The Registration Statement represented that Caribou was using its "chRDNA technology to enhance, or armor, our cell therapies." The Registration Statement touted CB-010 as the "first clinical-stage allogeneic anti-CD19 CAR-T cell therapy."

7. Additionally, the Registration Statement represented that "[w]e have demonstrated in preclinical models that the PD-1 knockout improves the persistence of antitumor activity."[1] Specifically, the Company's "preclinical in vivo data from experiments conducted in mouse xenograft models ... demonstrate that knocking out PD-1 leads to a significant increase in the durability of antitumor activity."

[1] According to Caribou, the Company designed CB-010 using three CRISPR edits: "1) we knock out the TRAC gene to remove the T cell receptor, 2) we site- site specifically insert an anti-CD19 CAR into the trac gene, and 3) we knock out PD-1." The last of these three steps, removing or "knocking out" the programmed cell death protein 1 ("PD-1") from the CAR-T cell surface by a genome-edited knockout of the PDCD1 gene, purportedly "boosted" antitumor activity.

8. The Offering Documents, however, contained untrue statements of material fact and/or omitted to state other facts necessary to make the statements made therein not misleading. Specifically, the Offering Documents omitted that: (i) knocking out the PD-1 protein would not significantly increase the durability of antitumor activity in humans and, as such, CB-010's design was not an improvement on competitors' designs; (ii) escalated dosing of CB-010 would, therefore, not improve its durability in a clinical trial; and (iii) results from a Phase 1 study had come out two months prior to Caribou's IPO which undermined the Company's proposition that knocking out PD-1 was linked to enhanced clinical performance.

9. Additionally, throughout the Relevant Period, the Individual Defendants issued or caused the Company to issue false and misleading statements that made it appear to investors that CB-010 was just as safe, effective, and durable as its autologous CAR-T cell counterpart while at the same time the Company was at risk of not having sufficient cash, liquidity, or other capital to finance its business.

10. For instance, on May 12, 2022, Caribou released initial results from its Phase 1 trial showing an 80% complete response ("CR")[2] rate as of the February 23, 2022 data cutoff date, and that patients with a CR at 28 days had maintained it at three months. Caribou chose to announce this 28-day data even though six-month data would be available the very next day, and interim data was already available. With respect to FDA-approved autologous therapies, Defendant Haurwitz stated that "the approved CAR-Ts that focus on CD19-positive disease have achieved overall response rates of about 50% to 70% and overall response rates of 30% to 50%. These include Gilead's Yescarta, Bristol Myers Squibb's Breyanzi and Novartis' Kymriah."

11. On June 10, 2022, however, the truth would be partially revealed as Caribou released updated results from its Phase 1 trial revealing that "[a]t 6 months following the single dose of CB-010, [only] 40% of patients remained in CR (2 of 5 patients) as of the May 13, 2022 data cutoff date." Following this news, Caribou's stock price fell 41.5%, to close at $5.10 per share on June 13, 2022.

[2] In cancer treatment, CR refers to the absence of all detectable cancer post treatment, whereas durability or durable response refers to the amount of time a patient remains in remission and does not relapse.

12. Defendants continued to assure investors that CB-010's unique mechanism of action boosted anti-tumor activity and would yield durable responses, especially considering that Caribou would soon start the dose escalation portion of its ANTLER Trial.

13. On July 13, 2023, the Company reported follow-up data from the ANTLER Trial. The released data showed that patients who received higher doses of CB-010 had continued relapsing, indicating that CB-010 was not in fact dose-dependent, and was no more effective or durable at even triple the initial dose. The Company also warned against comparing its results to its competitors' results at face value, cautioning that it "has not performed any head-to-head trials comparing any of these other CAR-T cell therapies with CB-010, and Caribou has only reviewed publicly available reports of those trials. As such, the results of these other clinical trials may not be comparable to clinical results for CB-010."

14. Following this news, Caribou's stock price fell $1.84 per share, or 22.6%, from a close of $8.14 per share on July 13, 2023, to close at $6.30 per share on July 14, 2023.

15. Also on July 13, 2023, the Company filed a preliminary prospectus supplement on Form 424B5 with the SEC ("the Preliminary Prospectus Supplement") in connection with the Company's pending public offering of its common stock (the "July 2023 Offering"). In discussing the purpose of the July 2023 Offering, the Preliminary Prospectus Supplement stated that "[w]e currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents, and marketable securities, to fund [*inter alia*] . . . preclinical development of our CB-020 product candidate[.]" In addition, the Preliminary Prospectus Supplement supposedly warned that the Individual Defendants "may" use the funds differently, but the risk of such an occurrence was unlikely, stating:

> Our management will have broad discretion in the application of the net proceeds, if any, from this offering and the amounts and timing of our actual expenditures will depend on numerous factors . . . . As of the date of this prospectus supplement, we cannot predict with certainty all of the particular uses for the net proceeds to be received upon the completion of this offering or the amounts that we will actually spend on the uses set forth above. The amounts and timing of our actual expenditures and the extent of our preclinical, clinical, and future development activities ***may*** vary significantly depending on numerous factors, including the progress of our development efforts, the status of and results from our ongoing and planned clinical trials, the timing of regulatory submissions and the outcome of regulatory review, our ability to take advantage of expedited programs or to obtain regulatory approval for product candidates, and the timing and costs associated with the manufacture and supply of our product candidates for clinical development or

> commercialization, as well as any collaborations that we may enter into with third parties for our product candidates and any unforeseen cash needs. Although ***we intend to spend the net proceeds of the offering as stated above***, circumstances ***may*** arise when, for sound business reasons, a re-allocation of funds ***may*** be necessary or advisable.[3]

16. The truth did not emerge until July 16, 2024 when, the Company announced on a Form 8-K filed with the SEC that it would no longer be continuing its preclinical research regarding the allogeneic CARN-NK platform so that it may "extend its cash runway (the "Discontinuation 8-K"). The Discontinuation 8-K also announced the Company would be reducing its workforce by approximately 12%.

17. On this news, the price of Caribou's stock fell $0.09 per share, or approximately 3.3%, from a close of $2.73 per share on July 16, 2024, to close at $2.64 per share on July 17, 2024.

18. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) knocking out the PD-1 protein would not significantly increase the durability of antitumor activity in humans and, as such, CB-010's design was not an improvement on competitors' designs and as compared to its own approved autologous CAR-T cell counterpart; (2) escalated dosing of CB-010 would, therefore, not improve its durability in a clinical trial; (3) as such, the Individual Defendants overstated CB-010's overall clinical results and commercial prospects; (4) Caribou's competitors had already achieved results comparable to early autologous CAR-T trials; (5) results from competitors' prior trials undermined Caribou's proposition that knocking out PD-1 improved durability; (6) the company was at a serious risk of running out of cash, liquidity, and/or other capital to fund its current operations, including preclinical research associated with the allogeneic CAR-NK platform; and (7) as a result of the foregoing, there would likely be a negative impact on the Company's business and operations. As a result of the foregoing, the Company's statements about its

---

[3] Unless stated otherwise, all emphasis added.

business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

19. In light of the Individual Defendants' misconduct—which subjected the Company, its President and Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), and certain current and former members of the Board of Directors ("Board") to a federal securities fraud class action lawsuit in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

20. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

21. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and resulting settlement of the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiffs' claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

23. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

24. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiffs**

26. Plaintiffs are current shareholders of Caribou. Plaintiffs have continuously held Caribou common stock at all relevant times.

**Nominal Defendant Caribou**

27. Caribou is a Delaware corporation with corporate headquarters located at 2929 7th Street, Suite 105, Berkeley, California 94710. Caribou's common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "CRBU."

**Defendant Haurwitz**

28. Defendant Haurwitz has served as President, CEO, and a Company director since October 2011.

29. The Schedule 14A the Company filed with the SEC on April 25, 2025 (the "2025 Proxy Statement") stated the following about Defendant Haurwitz:

> ***Rachel Haurwitz, Ph.D.,*** is a co-founder of Caribou and currently serves as our president and chief executive officer and as a director of our company, positions she has held since our company's inception in October 2011. Dr. Haurwitz is an inventor on patents and patent applications covering multiple CRISPR-based technologies and has co-authored several scientific papers characterizing CRISPR-Cas systems, including in Science. Since February 2020, she has served on the Board of Directors of the Biotechnology Innovation Organization (BIO). From November 2021 until July 2024, Dr. Haurwitz served on the Board of Directors of Seer, Inc. From July 2014 until November 2016, she served on the Board of Directors of Intellia Therapeutics, Inc., of which she is a co-founder. Dr. Haurwitz received her A.B. degree in Biological Sciences from Harvard College and her Ph.D. in Molecular and Cell Biology from the University of California, Berkeley, where she completed her thesis research in the laboratory of Dr. Jennifer A. Doudna. We believe that Dr. Haurwitz is qualified to serve on our Board based on her operational and historical expertise and experience as a co-founder, president and chief executive officer of our company, combined with her knowledge of CRISPR technology.

**Defendant O'Byrne**

30. Defendant O'Byrne served as the Company's CFO from February 2021 until September 2024.

31. The Schedule 14A filed by the Company with the SEC on April 25, 2024 (the "2024 Proxy Statement") stated the following about Defendant O'Byrne:

> ***Jason O'Byrne, M.B.A.,*** has served as our chief financial officer since February 2021. Prior to joining Caribou, he was Senior Vice President of Finance at Audentes Therapeutics, Inc., a gene therapy company, from April 2020 to February 2021, where he led finance. From April 2019 to April 2020, Mr. O'Byrne served as Vice President of Finance at Audentes. Before joining Audentes, he spent 13 years with Genentech, Inc., a member of the Roche Group, from February 2005 to December 2018, holding finance leadership and executive positions across the research, development, manufacturing, business development, and commercial functions. Earlier in his career, Mr. O'Byrne served as Regional Controller with General Chemical Corporation, a specialty chemical supplier, from September 2002 to January 2005, and as an engineer with General Motors, from September 1999 to September 2001. He received a B.A.Sc. in Mechanical Engineering from the University of British Columbia and an M.B.A. from New York University's Stern School of Business.

**Defendant Braunstein**

32. Defendant Braunstein has served as a Company director since June 2021. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee.

33. The 2025 Proxy Statement stated the following about Defendant Braunstein:

> ***Scott Braunstein, M.D.,*** has served on our Board since June 2021. Dr. Braunstein recently served as Chairman of the Board of Directors and Chief Executive Officer of Marinus Pharmaceuticals, Inc., positions he held from November 2022 and September 2018, respectively, until Marinus was acquired by Immedica Pharma AB in March 2025. Since August 2015, he has served as an operating partner at Aisling Capital, an investment firm. From July 2015 to March 2018, Dr. Braunstein served as Chief Strategy Officer and Chief Operating Officer at Pacira Pharmaceuticals, Inc., a pharmaceutical company. Prior to Pacira, Dr. Braunstein spent 12 years from February 2002 to June 2014 with J.P. Morgan Asset Management as a healthcare analyst and managing director on the U.S. equity team and as portfolio manager of the J.P. Morgan Global Healthcare Fund. He has served on the Boards of Directors of Atai Biosciences since June 2024, where he leads the Science and Technology Committee as well as serving as a member of the Audit Committee; of One Biosciences since March 2024; and of Site One Therapeutics since September 2018 where he leads the Compensation Committee. Dr. Braunstein previously served on the Boards of Directors of Constellation Pharmaceuticals from February 2019 to July 2021 (where he served as Chair of the Audit Committee); of Ziopharm Oncology, Inc. from September 2018 to November 2020; of Esperion Therapeutics, Inc. from June 2015 to April 2020

(where he served as Chair of the Audit Committee); of Protara Therapeutics, Inc. from May 2018 to July 2020 (where he served on the Audit Committee); and of Trevena, Inc. from October 2018 to January 2025 (where he served as a member of the Audit Committee and lead independent director). Dr. Braunstein began his career as a physician at the Summit Medical Group and as assistant clinical professor at Albert Einstein College of Medicine and Columbia University Medical Center. He received his B.S. in Biology from Cornell University and his M.D. from the Albert Einstein College of Medicine. We believe that Dr. Braunstein is qualified to serve on our Board based on his expertise and experience in governing, leading, and investing in biopharmaceutical companies.

**Defendant Guggenhime**

34. Defendant Guggenhime has served as a Company director and the Chair of the Board since April 2021. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee.

35. The 2025 Proxy Statement stated the following about Defendant Guggenhime:

***Andrew Guggenhime, M.B.A.,*** has served on our Board since April 2021. Mr. Guggenhime currently serves as President and Chief Financial Officer at Vaxcyte, Inc., a developer of vaccines, positions he has held since January 2021. He served as Chief Operating Officer and Chief Financial Officer of Vaxcyte from May 2020 to December 2020. Prior to joining Vaxcyte, he served as Chief Financial Officer of Dermira, Inc., a biopharmaceutical company, from April 2014 through the acquisition of the company by Eli Lilly and Company in February 2020. Prior to Dermira, Mr. Guggenhime served as Chief Financial Officer for CardioDx, Inc., a medical diagnostic company, from September 2011 to April 2014 and as a director of the company from April 2014 to July 2016. He also served as Chief Financial Officer for Calistoga Pharmaceuticals, Inc., a biopharmaceutical company, from September 2010 to April 2011, which was acquired by Gilead Sciences, Inc. in 2011, and as Chief Financial Officer for Facet Biotech Corporation, a biotechnology company, from December 2008 to June 2010, which was acquired by Abbott Laboratories in April 2010. Mr. Guggenhime previously served as Chief Financial Officer of PDL BioPharma, Inc., a biopharmaceutical company, until Facet Biotech was spun off from PDL BioPharma in December 2008. Prior to joining Facet Biotech, he served as Chief Financial Officer for Neoforma, Inc., a provider of supply chain management solutions, which was acquired by Global Healthcare Exchange, LLC in March 2006. Mr. Guggenhime began his career in financial services at Merrill Lynch & Co. and Wells Fargo & Company. He has served as a member of the Board of Directors of Sling Therapeutics, a privately held biopharmaceutical company, since June 2024. From July 2018 through March 2023, Mr. Guggenhime served on the Board of Directors of Metacrine, Inc., a clinical stage biopharmaceutical company. He received his B.A. in International Politics and Economics from Middlebury College and his M.B.A. from the J.L. Kellogg Graduate School of Management at Northwestern University. We believe that Mr. Guggenhime is qualified to serve on our Board based on his more than two decades of finance, strategic, and operational leadership experience at both private and public healthcare companies.

**Defendant Johnson**

36. Defendant Johnson has served as a Company director since May 2022. He also serves as a member of the Audit Committee.

37. The 2025 Proxy Statement stated the following about Defendant Johnson:

> ***David Johnson, M.B.A.,*** has served on our Board since May 2022. Mr. Johnson currently serves as the Chief Operating Officer of Vera Therapeutics, Inc. where he leads the commercial, product development and manufacturing, information technology, and facilities functions. Prior to joining Vera, he served as Chief Commercial Officer of Global Blood Therapeutics (acquired by Pfizer Inc.), a position he held from March 2018 to December 2022, where he led the global commercial functions and facilitated the launch of Oxbryta® in 2019. Previously, Mr. Johnson was employed by Gilead Sciences, Inc. from 2003 to 2018, where he held roles of increasing responsibility in the company's commercial organization, including as vice president, sales and marketing, Liver Disease Business Unit, where he was instrumental in building and leading Gilead's liver disease franchise, including launching four medicines for hepatitis. Prior to that, Mr. Johnson led the Antiviral Business Unit at Gilead, where he helped launch and oversee the HIV franchise. Before Gilead, he had an 11-year tenure at GlaxoSmithKline, where he held various positions in sales, product marketing, business development, global commercial strategy, and portfolio development. Mr. Johnson received his B.A. in Business Marketing from the University of Puget Sound and his M.B.A. from the Kenan-Flagler Business School at the University of North Carolina. We believe that Mr. Johnson is qualified to serve on our Board based on his extensive commercial experience in the biopharmaceutical industry.

**Defendant Richardson-Heron**

38. Defendant Richardson-Heron has served as a Company director since November 2021. She also serves as a member of the Nominating and Corporate Governance Committee.

39. The 2025 Proxy Statement stated the following about Defendant Richardson-Heron:

> ***Dara Richardson-Heron, M.D.,*** has served on our Board since November 2021. She currently serves as the President and Chief Executive Officer of DRH Consulting, a management and executive consulting firm, a position she has held since August 2021, has been an executive coach at The ExCo Leadership Group since January 2021, and serves as a board director at The Hastings Center for Bioethics. Additionally, Dr. Richardson-Heron is on the Board of Directors of the New York Foundation for Senior Citizens. Dr. Richardson-Heron served as Chief Patient Officer for Pfizer Inc., a biopharmaceutical company, from February 2020 to August 2021. Her previous executive leadership positions include Chief Engagement Officer and Scientific Executive for National Institutes of Health (March 2017 to January 2020); Chief Executive Officer of YWCA USA, Inc. (2012 to 2017); and Chief Executive Officer, Greater NYC Affiliate of Susan G. Komen for the Cure (2008 to 2012). Earlier in her career, she served as Assistant Executive Director/National Chief Medical Officer with United Cerebral Palsy of NYC/UCP

> Association and Executive Medical Director and Special Assistant to the Chairman and Chief Executive Officer at Consolidated Edison Company of New York, Inc. Dr. Richardson-Heron holds a B.A. in Biology from Barnard College and an M.D. from New York University School of Medicine. We believe Dr. Richardson-Heron is qualified to serve on our Board based on her executive leadership expertise and her experience representing the perspective of patients.

**<u>Defendant Sacks</u>**

40. Defendant Sacks has served as a Company director since May 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Science and Technology Committee.

41. The 2025 Proxy Statement stated the following about Defendant Sacks:

> ***Natalie Sacks, M.D.,*** has served on our Board since May 2018. Dr. Sacks is an oncologist and is currently a Venture Partner at Novo Holdings Ventures Investment. Previously, she was the Chief Medical Officer at Harpoon Therapeutics, Inc. (acquired by Merck & Co.) from October 2018 to June 2022. Prior to joining Harpoon, Dr. Sacks held various development leadership roles at multiple companies including Onyx Pharmaceuticals, Inc., a pharmaceutical company (acquired by Amgen Inc.), from April 2011 to February 2014; Aduro Biotech, Inc., a clinical stage biopharmaceutical company, from September 2016 to September 2018; Exelixis, Inc., a pharmaceutical company, from September 2009 to March 2011; and Cell Genesys, Inc., a biotechnology company, from November 2002 to April 2009. She has been responsible for all aspects of development, from IND through later-stage development. From October 2004 to October 2016, Dr. Sacks held a faculty appointment at the University of California, San Francisco, where she was a volunteer assistant clinical professor of medicine in the Division of Hematology/Oncology. From August 2017 through June 2023, Dr. Sacks served on the Board of Directors of Zymeworks, Inc., a clinical stage biotechnology company. She received her B.A. in Mathematics from Bryn Mawr College, her M.S. in Biostatistics from Harvard University School of Public Health, and her M.D. from the University of Pennsylvania School of Medicine. We believe that Dr. Sacks is qualified to serve on our Board based on her extensive experience developing early- and late-stage oncology therapeutics and her experience as a director of a public company and in executive leadership roles at multiple companies.

**<u>Defendant Whiting</u>**

42. Defendant Whiting has served as a Company director since August 2021. She also serves as the Chair of the Science and Technology Committee and as a member of the Compensation Committee.

43. The 2025 Proxy Statement stated the following about Defendant Whiting:

> ***Nancy Whiting, Pharm.D.,*** has served on our Board since August 2021. Dr. Whiting currently serves as the President and Chief Executive Officer and a member of the Board

of Directors at Recludix Pharma, a biotechnology company, positions she has held since September 2021. She spent almost 15 years (from 2007 to 2021) with Seagen Inc. (formerly Seattle Genetics), a biotechnology company, where she most recently served as Executive Vice President of Corporate Strategy. Dr. Whiting previously served as Executive Vice President of Late-Stage Development, Senior Vice President of Clinical Development and Medical Affairs, and Head of Experimental Medicine at Seagen. Since October 2023, Dr. Whiting has served on the Board of Directors of Boundless Bio, Inc. Prior to her tenure in the biopharmaceutical industry, she had a career in clinical pharmacy serving as a Clinical Oncology Pharmacist at Seattle Cancer Care Alliance, and previously as the Staff Pharmacist for the Bone Marrow Transplant and Acute Leukemia department at Vancouver Hospital. Dr. Whiting received her B.S. in Pharmacy from the University of British Columbia and received her Pharm.D. degree from the University of Washington. We believe Dr. Whiting is qualified to serve on our Board based on her extensive experience in all phases of drug development.

**Defendant Zheng**

44. Defendant Zheng has served as a Company director since September 2021. She also serves as a member of the Nominating and Corporate Governance Committee and the Science and Technology Committee.

45. The 2025 Proxy Statement stated the following about Defendant Zheng:

***Ran Zheng, M.S.,*** has served on our Board since September 2021. Ms. Zheng is currently the Chief Executive Officer of Landmark Bio, an Artis BioSolutions company focused on advancing the development of transformative new medicines. Prior to the acquisition of Landmark Bio by Artis BioSolutions, she was Chief Executive Officer and on the Board of Directors of Landmark Bio from 2021 to 2025. Ms. Zheng was the Chief Technical Officer at Orchard Therapeutics, a commercial-stage global gene therapy, from March 2019 to February 2021. In that role, she led the technical operations organization and helped advance the company's product pipeline. Ms. Zheng has also held leadership positions at multiple biotechnology companies, including Amgen Inc., a biopharmaceutical company, from 2003 to 2010, and Genzyme, a biotechnology company (now Sanofi), from 1996 to 2000. Ms. Zheng holds a B.S. in Biology from Beijing Forestry University and received an M.S. in Microbial Engineering from the University of Minnesota. We believe Ms. Zheng is qualified to serve on our Board based on her extensive leadership experience in the biotechnology industry.

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

46. By reason of their positions as officers, directors, and/or fiduciaries of Caribou and because of their ability to control the business and corporate affairs of Caribou, the Individual Defendants owed Caribou and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and

are required to use their utmost ability to control and manage Caribou in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Caribou and its shareholders so as to benefit all shareholders equally.

47. Each director and officer of the Company owes to Caribou and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

48. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Caribou, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

49. To discharge their duties, the officers and directors of Caribou were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

50. Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Caribou, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

51. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present

and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this amended consolidated complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

52. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Caribou were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Caribou's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Caribou conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Caribou and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Caribou's operations would comply with all applicable laws and Caribou's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

53. Each of the Individual Defendants further owed to Caribou and the shareholders the duty of loyalty requiring that each favor Caribou's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

54. At all times relevant hereto, the Individual Defendants were the agents of each other and of Caribou and were at all times acting within the course and scope of such agency.

55. Because of their advisory, executive, managerial, directorial, and controlling positions with Caribou, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

56. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Caribou.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

57. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

58. The purpose and effect of the conspiracy, common enterprise, and/or common course of

conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

59. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Caribou was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

60. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

61. At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Caribou and was at all times acting within the course and scope of such agency.

## CARIBOU'S CODE OF CONDUCT

62. Caribou's Code of Business Conduct, Scientific and Data Integrity, and Ethics (the "Code of Conduct") represents that it "is committed to maintaining the highest standards of business conduct and ethics." The Code of Conduct goes on to state that it "applies to every employee, consultant, contractor, and director of the Company."

63. In the section "Honest and Ethical Conduct" the Code of Conduct states:

> It is the policy of the Company to promote high standards of integrity by conducting our business in an honest and ethical manner. The integrity and reputation of the Company depends on the honesty, fairness, and integrity brought to the job by each person. Unyielding personal integrity is the foundation of corporate integrity.

64. In the section "Legal Compliance," the Code of Conduct states, in relevant part:

> Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee, consultant, contractor, and director operating within legal guidelines and cooperating with local, state, federal, and international authorities. We expect employees, consultants, contractors, and directors to understand the legal and regulatory requirements applicable to their areas of responsibility.
>
> * * *
>
> We expect employees, consultants, contractors, and directors to comply with all such laws and regulations. We may hold periodic training sessions to ensure that all employees comply with the relevant laws, rules, and regulations associated with their employment and areas of responsibility, including laws prohibiting insider trading (which are discussed in further detail in Section 3). If you have a question in the area of legal compliance, it is important that you seek answers from your manager, Human Resources, or the Compliance Officer (as described in Section 17).

65. In the section "Conflicts of Interest" the Code of Conduct states, in relevant part:

> We respect the rights of our employees, consultants, contractors, and directors to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, our employees, consultants, contractors, and directors should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of the Company. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees, consultants, contractors, and directors to be free from influences that conflict with the best interests of the Company or might deprive the Company of their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest are prohibited unless specifically authorized as described below.

66. In the section "Maintenance of Corporate Books, Records, Documents, and Accounts; Financial Integrity; Public Reporting" the Code of Conduct states, in relevant part:

> The integrity of our records and public disclosure depends upon the validity, accuracy, and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records must be accurate. The making of false or misleading entries, whether they relate to financial results or otherwise, is strictly prohibited. Our

> records serve as a basis for managing our business and are important in meeting our obligations to our stakeholders. As a result, it is important that our books, records, and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs, and expenses, as well as all transactions and changes in assets and liabilities. We require that:
>
> - no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;
> - transactions be supported by appropriate documentation;
> - the terms of sales, if applicable, and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;
> - employees comply with our system of internal controls; and
> - no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.
>
> Our accounting records are also relied upon to produce reports for our management, stockholders, and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely, and understandable disclosure and fairly present our financial condition and results of operations. Employees, consultants, contractors, and directors who collect, provide, or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to 7 assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.

67. In the section "Waivers," in which the Code of Conduct states:

> Any waiver of this Code for executive officers (including, where required by applicable laws, our principal executive officer, principal financial officer, principal accounting officer, or controller (or persons performing similar functions)) or directors may be authorized only by our Board of Directors or, to the extent permitted by the rules of The Nasdaq Stock Market, a committee of the Board of Directors, and will be disclosed as required by applicable laws, rules, and regulations.

68. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations

of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of the Exchange Act, and the aiding and abetting thereof. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain internal controls, failed to obtain waivers and/or failed to disclose obtained waivers of violating the Code of Conduct, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Codes of Conduct.

**CARIBOU'S AUDIT COMMITTEE CHARTER**

69. Caribou also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

> The purpose of the Audit Committee (the "Committee") of the board of directors (the "Board") of Caribou Biosciences, Inc. (the "Company") is to act on behalf of the Board in fulfilling the Board's oversight responsibilities with respect to (1) the Company's corporate accounting and financial reporting processes, systems of internal control over financial reporting, and audits of financial statements and systems of disclosure controls and procedures, as well as the quality and integrity of the Company's financial statements and reports, (2) the qualifications, independence, and performance of the Company's registered public accounting firm or firms engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services, (3) reviewing any reports or other disclosure required by the applicable rules and regulations of the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement and periodic reports within the scope of authority outlined herein, and (4) the performance of the Company's internal audit function, if any.
>
> The primary role of the Committee is to oversee the financial reporting and disclosure process. To fulfill this obligation, the Committee relies on management for the preparation and accuracy of the Company's financial statements; management for establishing effective internal controls and procedures to ensure the Company's compliance with accounting standards, financial reporting procedures, and applicable laws and regulations; and the Company's independent auditors for an unbiased, diligent audit or review, as applicable, of the Company's financial statements and the effectiveness of the Company's internal controls (to the extent applicable). The members of the Committee are not employees of the Company and are not responsible for conducting the audit or performing other accounting procedures.

70. Under the heading "Duties and Responsibilities," the Audit Committee Charter states the following, in relevant part:

A. To (1) select and retain an independent registered public accounting firm to act as the Company's independent auditors for the purpose of auditing the Company's annual financial statements, books, records, accounts, and internal controls over financial reporting (to the extent applicable), subject to ratification by the Company's stockholders of the selection of the independent auditors, (2) set the compensation of the Company's independent auditors, (3) oversee the work done by the Company's independent auditors, and (4) terminate the Company's independent auditors, if necessary. The independent auditors and each such other registered public accounting firm retained by the Committee shall report directly to the Committee.

* * *

D. Prior to the engagement of any prospective registered public accounting firm, and at least annually thereafter, to obtain and review a written statement by the Company's independent auditors that describes (1) the accounting firm's internal quality control procedures, (2) any material issues raised by the most recent internal quality control review, peer review or Public Company Accounting Oversight Board ("PCAOB") review or inspection of the firm or by any other inquiry or investigation by governmental or professional authorities in the past five years regarding one or more audits carried out by the firm and any steps taken to deal with any such issues, and (3) all relationships between the firm, or their affiliates, and the Company or any of its subsidiaries, or persons in financial oversight roles at the Company or its subsidiaries; and to discuss with the independent auditors the written statement and any relationships or services that may impact the objectivity and independence of the auditors, consistent with applicable PCAOB and SEC rules.

* * *

F. To review and discuss with the Company's independent auditors (1) the auditors' responsibilities under generally accepted auditing standards ("GAAP") and the responsibilities of management in the audit process, (2) the overall audit strategy, (3) the scope and timing of the annual audit, (4) any significant risks identified during the auditors' risk assessment procedures, and (5) when completed, the results, including significant findings, of the annual audit.

G. To review and discuss with the Company's independent auditors (1) all critical accounting policies and practices to be used in the audit, (2) all alternative treatments of financial information within GAAP that have been discussed with management, the ramifications of the use of such alternative treatments and the treatment preferred by the auditors, (3) communications between the Company's independent audit team and their national office with respect to accounting or auditing issues, and (4) other material written communications between the auditors and management.

* * *

J. To review with management and the Company's independent auditors the adequacy and effectiveness of the Company's financial reporting processes, internal control over financial reporting, and disclosure controls and procedures, including any significant deficiencies or material weaknesses in the design or operation of, and any material

changes in, the Company's processes, controls, and procedures, and any special audit steps adopted in light of any material control deficiencies, and any fraud involving management or other employees with a significant role in such processes, controls, and procedures, and review and discuss with management and the Company's independent auditors any disclosure relating to the Company's financial reporting processes, internal control over financial reporting, and disclosure controls and procedures, and, to the extent applicable, the independent auditors' report on the effectiveness of the Company's internal control over financial reporting and the required management certifications to be included in or attached as exhibits to the Company's annual report on Form 10-K or quarterly report on Form 10-Q, as applicable.

K. To review and discuss with the Company's independent auditors any other matters required to be discussed by applicable requirements of the PCAOB and the SEC.

L. To review and discuss with the Company's independent auditors and management the Company's annual audited financial statements (including the related notes), the form of audit opinion to be issued by the auditors on the financial statements, and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's annual reports on Form 10-K before the annual reports are filed.

M. To recommend to the Board that the audited financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" be included in the Company's annual report on Form 10-K and whether the annual report on Form 10-K should be filed with the SEC; and to produce the audit committee report required to be included in the Company's proxy statement.

N. To review and discuss with the Company's independent auditors and management the Company's quarterly financial statements and the disclosure under "Management's Discussion and Analysis of Financial Condition and Results of Operations" to be included in the Company's quarterly reports on Form 10-Q before the quarterly reports are filed.

O. To review with management and the Company's independent auditors, to the extent appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies (including, without limitation, reviewing any pro forma or non-GAAP information), which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

* * *

R. To review and discuss with management the risks faced by the Company and the policies, guidelines, and processes by which management assesses and manages the Company's risks, including the Company's major financial risk exposures and cybersecurity risk exposures, and the steps management has taken to monitor and control such exposures.

> S. To monitor compliance with the Company's Code of Business Conduct, Scientific and Data Integrity, and Ethics (the "Code"), to investigate any alleged breach or violation of the Code, and to enforce the provisions of the Code. Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee, though the Committee may defer any decision with respect to any waiver to the Board. The Committee will review and reassess the adequacy of this Code at least annually, and recommend to the Board any changes the Committee determines are appropriate.
>
> * * *
>
> U. To review, with the Chief Legal Officer and, as applicable, outside legal counsel, certain legal and regulatory matters, including legal cases against or regulatory investigations of the Company and its subsidiaries that could have a significant impact on the Company's financial statements.

71. In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## CARIBOU'S SCIENCE AND TECHNOLOGY COMMITTEE CHARTER

72. Caribou also maintains a Science and Technology Committee Charter (the "Science and Technology Committee Charter") which governs the Science and Technology Committee's roles and responsibilities. The Science and Technology Committee Charter states the following regarding the purpose of the Science and Technology Committee:

> The purpose of the Science and Technology Committee (the "Committee") of the board of directors (the "Board") of Caribou Biosciences, Inc. (the "Company") is to assist the Board in its review of the Company's technology platforms and research and development programs and to assess possible technologies to be acquired by, licensed to, or otherwise accessed by the Company.

73. Under the heading "Duties and Responsibilities," the Science and Technology Committee Charter states the following:

The Committee shall have the following authority and responsibilities:

A. To review and evaluate the Company's scientific and technology development strategies and progress as well as its research and development (the "Research").

B. To advise the Board on the Committee's assessment of the Research.

C. To periodically discuss the Research with one or more of the persons serving on the Company's Scientific Advisory Board (the "SAB") as the Committee deems necessary or advisable.

D. To assess possible technologies to be acquired by, licensed to, or otherwise accessed by the Company (the "New Technologies").

E. To provide recommendations to the Board regarding selection of the New Technologies by the Company.

F. To provide guidance on the Company's clinical trials.

74. In violation of the Science and Technology Committee Charter, the Individual Defendants failed to properly assess the Company's research pipeline and provide appropriate guidance as to the Company's clinical trials, specifically the progress of the ANTLER Trial and the durability of CB-010, leading to the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public.

## **INDIVIDUAL DEFENDANTS' MISCONDUCT**

### **Background**

75. Caribou is a medical testing company that specializes genome-edited allogeneic, or "off-the-shelf," cell therapies that are used to treat patients with hematologic malignancies. Allogeneic cell therapies are considered "off-the-shelf" because they use cells that had previously been collected from a donor before being modified, multiplied, and stored in a facility prior to being fused into a patient. The Company claims that these characteristics grant allogeneic cell therapies significant advantages as opposed to their autologous counterparts, which rely on extracting, modifying, and multiplying a patient's own cells before being infused back into that same patient.

76. Among the therapies in the Company's research and development pipeline are allogeneic cell therapies such as its CAR-T cell and CAR-NK cell platforms. The Company's lead product candidate is CB-010, which is an allogeneic anti-CD19 CAR-T cell therapy that is being evaluated for use in patients

with r/r B-NHL through the Company's ANTLER Phase 1 clinical trial, focusing on second-line LBCL. Caribou touted CB-010 as the first allogeneic CAR-T cell therapy that removed the PD-1 from the CAR-T cell surface by a genome-edited knockout of the PDCD1 gene, which purportedly boosts antitumor activity.

77. Within the Company's CAR-NK platform is the CB-020, which was being evaluated as a cell therapy to overcome issues surrounding the targeting of solid tumors. Despite the fact that CB-020's development was paused between November 2023 and March 2024, the Individual Defendants continued to claim that the Company was still developing and advancing its CAR-NK platform with the hope of treating multiple diseases.

78. Prior to the IPO, the Individual Defendants knew or should have known, but failed to disclose, that the Company's competitors had already achieved results comparable to early autologous Car-T treatments. On October 21, 2020, for instance, CRISPR Therapeutics AG ("CRISPR"), a Caribou competitor also focusing on allogeneic cell therapy, released top-line results from its ongoing Phase 1 CARBON trial of CTX110, an allogeneic CAR-T cell therapy targeting CD19+ B-cell malignancies. The results showed CR rates of 33%, 50%, and 100% at dose levels 2, 3, and 4, respectively, at three months.

79. On June 4, 2021, Allogene Therapeutics, Inc. ("Allogene") released updated data for its allogeneic gene-editing treatment for non-Hodgkin lymphoma. The data showed a six-month CR rate of 36% in CAR T naïve LBCL patients treated with ALLO-501 and a CR rate of 50% in certain patients, on par with autologous CAR T therapies.

80. Additionally, at the time of the IPO, the Company had collected data from studies performed in mice regarding overall tumor burden and cancer progression after Day 108 and survivability after day 160. Despite knowing that 6 months of data is the minimum necessary to demonstrate treatment durability, the Offering Documents either concealed from investors mice data past 5.3 months or failed to continue to study mice past 5.3 months. Accordingly, the Offering Documents had no basis on which to assure investors that Caribou's preclinical data signaled durability absent more robust and adequate disclosures.

81. Further, a Phase 1 clinical trial sponsored by Gracell Biotechnologies Inc. ("Gracell") that

concluded two months prior had tested a treatment that knocked out PD-1 in relapsed cancer patients (the "Gracell Trial"). The Gracell Trial only generated a response in 2 out of 15 patients. Researchers involved in the trial explained that the "poor clinical response implies that CAR-T cell-intrinsic modification alone, for example, knocking out PD-1 in CAR-T cells, may not be enough to induce promising outcomes in the treatment of patients." The Offering Documents failed to disclose the existence, let alone results of, the Gracell Trial, nor that its results undermined the Company's statements concerning durability.

82. Following its IPO on July 23, 2021, Caribou stock began publicly trading on the NASDAQ. Pursuant to the Offering Documents, Caribou issued 19 million shares of common stock to the public at the Offering price of $16.00 per share for proceeds of $282.72 million to the Company, before expenses, and after applicable underwriting discounts, valuing Caribou at approximately $907.3 million.

## FALSE AND MISLEADING STATEMENTS

***The Offering Documents***

83. The Registration Statement contained untrue statements of material fact and omitted to state other facts necessary to make the statements not misleading under the circumstances under which they were made.

84. With respect to CB-010's PD-1 knockout effect and the treatment's attendant clinical prospects, the Registration Statement stated, among other things:

> We use Cas9 chRDNA guides to make three edits to manufacture CB-010. We introduce, with high efficiency and specificity, the gene encoding the CD19-specific CAR into the gene encoding the T cell receptor alpha constant, or TRAC, a component of the native T cell receptor, or TCR. This simultaneously integrates the CD19 CAR site-specifically into the T cell genome and eliminates TCR expression to reduce the risk of graft versus host disease, or GvHD. ***We also knock out the gene encoding the PD-1 protein in these cells to boost the persistence of CAR-T cell antitumor activity. We believe that the PD-1 knockout has the potential to reduce the likelihood of rapid tumor recurrence and potentially confer a better therapeutic index compared to other allogeneic CAR-T cells. To our knowledge, CB-010 is the first allogeneic CAR-T cell therapy with a PD-1 knockout in clinical studies*** and it is being evaluated in our open-label, multicenter ANTLER phase 1 clinical trial in the United States in adults with relapsed or refractory B cell non-Hodgkin lymphoma (NCT04637763). We have dosed the first patient in this clinical trial. We expect to have initial data from this clinical trial in 2022.

85. The Registration Statement also touted PD-1 knockout as a solution to the problem that

allogeneic treatments have had with persistence, due to the human immune system attacking the foreign donor cells:

> Our first lead product candidate, CB-010, is, to our knowledge, the first clinical-stage allogeneic anti-CD19 CAR-T cell therapy with PD-1 removed from the CAR-T cell surface by a genome-edited knockout of the PDCD1 gene. ***We have demonstrated in preclinical models that the PD-1 knockout improves the persistence of antitumor activity by disrupting a pathway that leads to rapid T cell exhaustion***. We have dosed the first patient in our ANTLER phase 1 clinical trial for CB-010, a study in patients with relapsed or refractory B cell non-Hodgkin lymphoma, with initial data expected in 2022.

86. The Registration Statement further claimed the Company had a competitive edge over other companies developing allogeneic therapies, stating, in relevant part:

> The genome-editing technologies currently used in the allogeneic cell therapy field generally have limited efficiency, specificity, and versatility for performing the multiple, precise genomic edits necessary to address insufficient persistence. Our chRDNA technology is designed to address these genome-editing limitations and improve cell therapy activity. By applying this approach to allogeneic cell therapies, we believe we can unlock their full potential by improving upon their effectiveness and durability.

87. The Registration Statement also touted the Company's preclinical data from a study performed in mice, presenting data for 160 days of study in which mice were given either a control injection, CB-010 without PD-1 knockout, or CB-010 with the PD-1 knockout. With respect to CB-010's clinical prospects based on the mice study, the Registration Statement stated, in relevant part:

> In our preclinical studies, we demonstrated that the removal of the PD-1 checkpoint from the CB-010 CAR-T cells provided a statistically significant survival advantage in mice bearing robust and metastatic B cell tumors.
>
> ***
>
> ***Overall, our data demonstrate that the removal of the PD-1 checkpoint from the CB-010 CAR-T cells provided a statistically significant survival advantage in mice bearing robust and metastatic B cell tumors. Our data suggest that the PD-1 knockout may have led to a more robust debulking of the tumor by CB-010 during the early part of the study compared to the conventional allogeneic CD19 CAR-T cells, leading to a reduction in the recurrence of the tumor cells***. Based on these data, we believe CB-010 has the potential for a better therapeutic index compared to other allogeneic CAR-T cells. If a lower dose of CB-010 has meaningful activity in the clinical setting, it would lead to several potential advantages including limited toxicity, increased numbers of doses per manufacturing run, and a reduced cost of goods.

88. The Registration Statement provided the following, in relevant part, concerning the purported durability of CB-010's treatment effectgranted by the PD-1 knockout strategy:

> One of the approaches we deploy to increase the persistence of CAR-T cell antitumor activity is to remove PD-1 from the CAR-T cell surface . . . . We believe that knocking out PD-1 will maintain the CAR-T cells in a higher antitumor state for a longer period of time, and we believe this will result in greater initial tumor debulking in the patient which will lead to long-term durability of CAR-T cell antitumor activity .... ***[O]ur preclinical in vivo data from experiments conducted in mouse xenograft models submitted as part of our CB-010 IND [Investigational New Drug Application] demonstrate that knocking out PD-1 leads to a significant increase in the durability of antitumor activity and therefore overall mouse survival***. To our knowledge, our lead product candidate [CB-010] is the first allogeneic CAR-T cell therapy in a clinical study with a PD-1 knockout, and we believe will drive the durability of allogeneic CAR-T cell antitumor activity.

89. The Offering Documents statements detailed above were materially false and misleading when made and failed to disclose material facts necessary to make them not misleading. Specifically, the Offering Documents failed to disclose: (1) the existence of the Gracell Trial; (2) that the Gracell Trial had already demonstrated that knocking out the PD-1 protein was not linked to enhanced durability or clinical performance, undermining the purportedly unique advantage of CB-010 as a treatment; (3) that the pre-clinical data in the Registration Statement did not go past 5.3 months and, given that 6 months is the minimum threshold for durability, Caribou therefore lacked the clinical data to show that the PD-1 knockout would improve allogeneic durability; and (4) that Caribou's competitors in the allogeneic gene-editing space had already published data that showed comparable or better durability data than approved autologous therapies. As a result, the Offering Documents' positive statements concerning Caribou's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The September 2, 2021 Form 10-Q***

90. On September 2, 2021, Caribou filed its quarterly report for the second quarter of the 2021 Fiscal Year on Form 10-Q with the SEC (the "Q2 2021 10-Q"). The Q2 2021 10-Q was signed by Defendants Haurwitz and O'Byrne and attached pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q2 2021 10-Q and that the Q2 2021 10-Q "does not contain any untrue

statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91. Regarding the claimed novelty of CB-010 and the durability of its treatment effect, the Q2 2021 10-Q stated, in relevant part, that:

> ***Our lead product candidate, CB-010, is, to our knowledge, the first clinical-stage allogeneic anti-CD19 CAR-T cell therapy with programmed cell death protein 1 ("PD-1") removed from the CAR-T cell surface by a genome-edited knockout of the PDCD1 gene. We have demonstrated in preclinical models that the PD-1 knockout improves the persistence of antitumor activity*** by disrupting a pathway that leads to rapid T cell exhaustion.

***The November 9, 2021 Form 10-Q***

92. On November 9, 2021, Caribou filed its quarterly report for the third quarter of the 2021 Fiscal Year on Form 10-Q with the SEC (the "Q3 2021 10-Q"). The Q3 2021 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q3 2021 10-Q and that the Q3 2021 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

93. The Q3 2021 10-Q contained substantially the same statements as the Q2 2021 10-Q reference above concerning CB-010 being the "first clinical-stage allogeneic anti-CD19 CAR-T cell therapy" with PD-1 knocked out and Caribou's "demonstrat[ion] in preclinical models" of CB-010's resulting ability to "improve[] the persistence of antitumor activity." *See supra* ¶ 91.

***The March 21, 2022 Form 10-K***

94. On March 21, 2022, the Company filed its annual report on Form 10-K for the 2021 Fiscal Year (the "2021 10-K"). The 2021 10-K was signed by Defendants Haurwitz, O'Byrne, Braunstein, Guggenhime, Richardson-Heron, Sacks, Whiting, and Zheng and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the 2021 10-K and that the 2021 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make

the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

95. The 2021 10-K contained substantially the same statements as the Q2 2021 10-Q reference above concerning CB-010 being the "first clinical-stage allogeneic anti-CD19 CAR-T cell therapy" with PD-1 knocked out and Caribou's "demonstrat[ion] in preclinical models" of CB-010's resulting ability to "improve[] the persistence of antitumor activity." *See supra* ¶ 91.

96. Additionally, the 2021 10-K stated that "our preclinical *in vivo* data from experiments conducted in mouse xenograft models submitted as part of our CB-010 IND application demonstrate that knocking out PD-1 leads to a significant increase in the durability of antitumor activity and therefore overall mouse survival."

97. The 2021 10-K also noted that the Company's *in vitro* studies showed that "CB-010 cells demonstrate dose-dependent and robust cytotoxic activity at a range of effector-to-target ratios compared to negative control cells."

***The May 9, 2022 Form 10-Q***

98. On May 9, 2022, Caribou filed its quarterly report for the first quarter of the 2022 Fiscal Year on Form 10-Q with the SEC (the "Q1 2022 10-Q"). The Q1 2022 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q1 2022 10-Q and that the Q1 2022 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

99. The Q1 2022 10-Q contained substantially the same statements as the Q2 2021 10-Q reference above concerning CB-010 being the "first clinical-stage allogeneic anti-CD19 CAR-T cell therapy" with PD-1 knocked out and Caribou's "demonstrat[ion] in preclinical models" of CB-010's resulting ability to "improve[] the persistence of antitumor activity." *See supra* ¶ 91.

***The May 12, 2022 Press Release and Fierce Biotech Article***

100. On May 12, 2022, Caribou issued a press release, which announced "Positive Initial Data

for CB-010 Anti-CD19 Allogeneic CAR-T Cell Therapy." The press release added:

> -- 100% ORR (5 of 5 patients) and 80% CR (4 of 5 patients) achieved following 1 dose at the initial dose level in patients with aggressive r/r B-NHL
>
> -- CB-010 is the 1st allogeneic CAR-T cell therapy to achieve 100% ORR (5 of 5 patients)– --

101. The press release also specifically stated that "[a]s of the February 23, 2022 data cutoff date, 6 patients had been treated with CB-010 and 5 had completed the 28-day dose limiting toxicity evaluation period. 100% (n=5) achieved a response; 80% (n=4) achieved a CR, and 20% (n=1) achieved a partial response (PR). All 4 patients who achieved a CR at 28 days had an ongoing CR at 3 months." As a result, the Company's "***initial results demonstrate[ed] a 100% overall response rate (ORR) and 80% complete response rate (CR)*** in cohort 1 (n=5 evaluable) from its ANTLER Phase 1 trial for CB-010 in patients with relapsed or refractory B cell non-Hodgkin lymphoma (r/r B-NHL)."

102. Defendant Haurwitz was quoted in the press release as stating that "[t]hese excellent initial outcomes represent important steps toward ***validating our chRDNA genome-editing platform as well as our plans for future development of CB-010 and our broader pipeline***" and touting CB-010 as "the ***first*** allogeneic anti-CD19 CAR-T cell therapy in the clinic with a PD-1 knock-out, a genome-editing strategy designed to limit premature CAR-T cell exhaustion…"

103. Also on May 12, 2022, Defendant Haurwitz was quoted in an article published by *Fierce Biotech*, comparing these results to approved autologous therapies: "the approved CAR-Ts that focus on CD19-positive disease have achieved overall response rates of about 50% to 70% and overall response rates of 30% to 50%. These include Gilead's Yescarta, Bristol Myers Squibb's Breyanzi and Novartis' Kymriah."

104. The statements in ¶¶ 83-103 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Caribou was not the first to use the PD-1 knockout in an allogeneic CAR-T cell treatment; (2) the Gracell Trial had already demonstrated that knocking out the PD-1 protein was not linked to enhanced durability or performance; (3) Caribou lacked sufficient preclinical data to conclude that the PD-1 knockout improved the persistence of anti-tumor activity because its pre-clinical data did not go beyond 5.3 months; (4) there was no reasonable basis to state that CB-010 demonstrated dose

dependency; and (5) six-month data from the ANTLER trial demonstrated that CB-010 lacked durability. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH STARTS EMERGING AS FALSE AND MISLEADING STATEMENTS CONTINUE

***The June 10, 2022 Press Release***

105. On June 10, 2022, Caribou issued a press release reporting "positive" data from the ANTLER Phase 1 clinical trial. Among other results, the Company reported that "[a]t 6 months following the single dose of CB-010, [only] ***40% of patients remained in CR (2 of 5 patients) as of the May 13, 2022 data cutoff date***." Just one month prior to this press release, the Company had reported data showing **80% CR** at 3 months.

106. As was stated by Jacob Plieth of Evaluate Vantage later that day:

> Caribou has hailed its Crispr-edited CD19-targeting lead project, CB-010, as the first ever off-the-shelf Car-T to show a 100% complete response rate. Unfortunately, this does not tell the whole story: as the group's EHA poster revealed today, few of the remissions are durable.
>
> Caribou thus appears to be the latest allogeneic Car-T player to run into the problem of relapse, after this issue last year derailed Allogene, Crispr Therapeutics and Precision Biosciences.
>
> * * *
>
> [B]y six months three of the six patients relapsed with progressive disease. Two of the three remaining CRs were ongoing beyond six months, and Caribou added that the first patient treated remained in CR at their 12-month scan, after the abstract's cutoff date. All six subjects received the first dose level of 40 million cells, but it will not go unnoticed that the most durable CR is in follicular lymphoma, a relatively slow-growing disease.

107. On this news, Caribou's stock price fell $3.62 per share, or 41.5%, from a close of $8.72 per share on June 12, 2023, to close at $5.10 per share on June 13, 2022. Despite this, the Individual Defendants continued to mislead the public.

***The June 10, 2022 EHA Conference***

108. Later that same day, on June 10, 2022, the Company presented six-month data for the CB-

010 ANTLER Trial at the European Hematology Association ("EHA") Conference. During the EHA conference call and webcast, Steven Kanner, Caribou's Chief Scientific Officer stated that "on the poster in a preclinical model where we allowed the mice to become heavily burdened by tumor growth for quite some time and then we did the treatments and what you see is that CB-010 leads to longer durability than an identical cell without the PD-1 knockout…"

109. In response to an analyst's question, Defendant Haurwitz stated:

> [W]hether we expect efficacy to improve the higher doses[,] to be fair and maybe a bit tongue and cheek, it's pretty hard to beat 100% CR rate and I think what we're really focused on at this point is the durability of these responses. To the snapshot of data that we have today is 40% of patients remaining in CR six months out, which we think is very promising initial data and obviously something we'll continue to track for patients at this dose level as well as in dose level two. That's really a big motivator for moving to 80 million cells for the second cohort.

***The August 9, 2022 Form 10-Q***

110. On August 9, 2022, Caribou filed its quarterly report for the second quarter of the 2022 Fiscal Year on Form 10-Q with the SEC (the "Q2 2022 10-Q"). The Q2 2022 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q2 2022 10-Q and that the Q2 2022 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

111. The Q2 2022 10-Q continued to highlight Caribou's "de***monstrat[ion] in preclinical models***" of CB-010's purported ability to "***improve[] the persistence of antitumor activity.***" *See supra* ¶ 91.

***The August 11, 2022 Proxy Statement***

112. On August 11, 2022, Caribou filed a proxy statement on Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

113. The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Braunstein and Zheng to the Board for a three-year term; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2022.

114. With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated:

> We have adopted a written Code of Business Conduct, Scientific and Data Integrity, and Ethics ("Code of Conduct") that applies to all of our employees, consultants, contractors, and directors. A current copy of the Code of Conduct is available on the Corporate Governance section of our website, https://investor.cariboubio.com. The audit committee is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for our executive officers and directors. We expect that any amendments to the Code of Conduct, or any waivers of its requirements with respect to our executive officers and directors, will be disclosed on our website at the address indicated above. Our website and the information contained therein or connected thereto shall not be deemed to be incorporated into this proxy statement. We have included our website address as an inactive textual reference only. We will provide to any person, without charge, a copy of the Code of Conduct. Any such request should be directed to Caribou Biosciences, Inc., 2929 7th Street, Suite 105, Berkeley, CA 94710, Attn: Chief Legal Officer and Corporate Secretary, telephone: 510-982-6030.

115. Regarding the "Role of our Board in Risk Oversight Process," the 2022 Proxy Statement stated the following:

> Although our officers are responsible for the day-to-day management of risks, our Board has broad oversight responsibility for our company's risk management programs. Our officers are charged with identifying material risks that we face; implementing strategies to address specific material risk exposures; evaluating risk and risk management with respect to business decision-making throughout our company; and efficiently and promptly transmitting relevant risk-related information to our Board or appropriate committee, so as to enable them to conduct appropriate risk management oversight.
>
> Our Board performs an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks, and operational risks. The audit committee is responsible for overseeing the management of our major financial risk exposures, including risks relating to accounting matters and financial reporting, legal and compliance risks, and cyber security risks. As part of this oversight, the audit committee receives regular reports from management on such risks at its regularly scheduled meetings, including reports not less than twice per year relating to data privacy and cybersecurity and the actions management has taken to limit, monitor, or control such exposures. The compensation committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. The

> NCG committee is responsible for overseeing the management of risks associated with the independence of our Board and potential conflicts of interest. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through discussions from committee members about such risks.

116. Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Caribou was not the first to use the PD-1 knockout in an allogeneic CAR-T cell treatment; (2) the Gracell Trial had already demonstrated that knocking out the PD-1 protein was not linked to enhanced durability or performance; (3) Caribou lacked sufficient preclinical data to conclude that the PD-1 knockout improved the persistence of anti-tumor activity because its pre-clinical data did not go beyond 5.3 months; (4) there was no reasonable basis to state that CB-010 demonstrated dose dependency; and (5) six-month data from the ANTLER trial demonstrated that CB-010 lacked durability. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

117. The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

118. As a result of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Braunstein and Zheng to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

***The November 8, 2022 Form 10-Q and Press Release***

119. On November 8, 2022, Caribou filed its quarterly report for the third quarter of the 2022

Fiscal Year on Form 10-Q with the SEC (the "Q3 2022 10-Q"). The Q3 2022 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q3 2022 10-Q and that the Q3 2022 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

120. The Q3 2022 10-Q continued to tout Caribou's "***demonstrat[ion] in preclinical models***" of CB-010's purported ability to "***improve[] the persistence of antitumor activity.***" *See supra* ¶ 91.

121. Also on November 8, 2022, Caribou issued a press release reporting financial results from the quarter and providing a business update. Defendant Haurwitz was quoted in the press release as stating:

> ***We have seen highly promising results from our lead allogeneic cell therapy, CB-010, at the lowest starting dose*** in the ANTLER clinical trial in patients with [r/r -NHL] . . . . ***The . . . antitumor activity for CB-010 at dose level 1 are encouraging***, and we look forward to generating additional efficacy and durability data from the dose escalation phase of the ANTLER trial.

***The November 17, 2022 Jefferies LLC London Healthcare Conference***

122. On November 17, 2022, Defendant Haurwitz presented at the Jefferies LLC London Healthcare Conference on behalf of the Company. During her presentation, Defendant Haurwitz stated, in relevant part:

> Quite remarkably, we saw a 100% complete response rate as best response, which to the best of my knowledge is the best anyone has seen for a cell therapy at such a low dose. And importantly, we've now observed a 50% six-month CR rate, showing really quite promising and durable activity. To put this in context, what we often hear from KOLs in this space, is that there are real world experience with their patients in the clinic today, is about a 33% six months CR rate with autologous CAR-Ts. So we think this is a really compelling start, especially considering that it's only just level 1.

***The December 7, 2022, Bank of America 2022 Biotech SMID Cap Conference***

123. On December 7, 2022, Defendant Haurwitz presented at the Bank of America 2022 Biotech SMID Cap Conference on behalf of the Company. In response to an analyst's question during the conference, Defendant Haurwitz stated, in relevant part:

> To your point, clearly duration of response is really important in this field. And often what we hear from physicians today whose patients are getting the approved commercial antilogous [ph] CAR-T products they're seeing something like 30 to 35% six months CR rates in the real world clinic experience. And so, we were really pleased a little bit later this year to share a 50% six month CR rate for this initial cohort of patients.

***The December 12, 2022, Press Release***

124. On December 12, 2022, Caribou issued a press release reporting 12-month clinical data from cohort 1 in the ANTLER trial where patients were still given the initial 40x60 CAR-T cell dose, showing only 2 of 6 patients continued. Nevertheless, Defendant Haurwitz represented that, "[t]he long-term durability at dose level 1 is comparable to autologous cell therapies and we believe CB-010 has the potential to set a new therapeutic bar for what allogeneic anti-CD19 CAR-T cell therapies can achieve."

***The March 9, 2023 Form 10-K and Press Release***

125. On March 9, 2023, the Company filed its annual report on Form 10-K for the 2022 Fiscal Year (the "2022 10-K"). The 2022 10-K was signed by Defendants Haurwitz, O'Byrne, Braunstein, Guggenhime, Richardson-Heron, Johnson, Sacks, Whiting, and Zheng and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the 2022 10-K and that the 2022 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

126. The 2022 10-K continued to tout Caribou's "demonstrat[ion] in preclinical models" of CB-010's purported ability to "improve[] the persistence of antitumor activity." *See supra* ¶ 91.

127. Also on March 9, 2023, the Company issued a press release in connection with fourth quarter and full year 2023 financial results and providing a business update. Defendant Haurwitz was quoted in the press release as stating, in relevant part, that "[t]he initial dose level of CB-010 demonstrated 6-month complete response rates that have the potential to rival the responses seen with approved autologous CAR-T cell therapies."

***The April 28, 2023 Proxy Statement***

128. On April 28, 2023, Caribou filed a proxy statement on Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron,

Sacks, Whiting, and Zheng solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions

129. The 2023 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Guggenhime, Johnson, and Whiting to the Board for a three-year term; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the fiscal year ended December 31, 2023.

130. With respect to the Company's Code of Conduct, the 2023 Proxy Statement stated:

> We have adopted a written Code of Business Conduct, Scientific and Data Integrity, and Ethics ("Code of Conduct") that applies to all of our employees, consultants, contractors, and directors. A current copy of the Code of Conduct is available on the Corporate Governance section of our website, https://investor.cariboubio.com. The audit committee is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for our executive officers and directors. We expect that any amendments to the Code of Conduct, or any waivers of its requirements with respect to our executive officers and directors, will be disclosed on our website at the address indicated above. Our website and the information contained therein or connected thereto shall not be deemed to be incorporated into this proxy statement. We have included our website address as an inactive textual reference only. We will provide to any person, without charge, a copy of the Code of Conduct. Any such request should be directed to Caribou Biosciences, Inc., 2929 7th Street, Suite 105, Berkeley, CA 94710, Attn: Chief Legal Officer and Corporate Secretary, telephone: 510-982-6030.

131. Regarding the "Role of our Board in Risk Oversight Process," the 2023 Proxy Statement stated the following:

> Although our officers are responsible for the day-to-day management of risks, our Board has broad oversight responsibility for our company's risk management programs. Our officers are charged with identifying material risks that we face; implementing strategies to address specific material risk exposures; evaluating risk and risk management with respect to business decision-making throughout our company; and efficiently and promptly transmitting relevant risk-related information to our Board or appropriate committee, so as to enable them to conduct appropriate risk management oversight.
>
> Our Board performs an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks, and operational risks. The audit committee is responsible for overseeing the management of our major financial risk exposures, including risks relating to accounting matters and financial reporting, legal and compliance risks, and cyber security risks. As part of this oversight, the audit committee receives regular reports from management on such risks at its regularly scheduled meetings, including reports not less than twice per year relating to

> data privacy and cybersecurity and the actions management has taken to limit, monitor, or control such exposures. The compensation committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. The NCG committee is responsible for overseeing the management of risks associated with the independence of our Board and potential conflicts of interest. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through discussions from committee members about such risks.

132. Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Caribou was not the first to use the PD-1 knockout in an allogeneic CAR-T cell treatment; (2) the Gracell Trial had already demonstrated that knocking out the PD-1 protein was not linked to enhanced durability or performance; (3) Caribou lacked sufficient preclinical data to conclude that the PD-1 knockout improved the persistence of anti-tumor activity because its pre-clinical data did not go beyond 5.3 months; (4) there was no reasonable basis to state that CB-010 demonstrated dose dependency; and (5) six-month data from the ANTLER trial demonstrated that CB-010 lacked durability. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

133. The 2023 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

134. As a result of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng caused the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Braunstein and Zheng to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

***The May 9, 2023 Form 10-Q***

135. On May 9, 2023, Caribou filed its quarterly report for the first quarter of the 2023 Fiscal Year on Form 10-Q with the SEC (the "Q1 2023 10-Q"). The Q1 2023 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q1 2023 10-Q and that the Q1 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

136. In relevant part, the Q1 2023 10-Q stated, regarding the purported durability of CB-010's treatment effect that "***We have demonstrated in preclinical models that the PD-1 knockout improves the durability of antitumor activity*** by disrupting a pathway that leads to rapid T cell exhaustion."

137. The statements in ¶¶ 108-111, 119-127, 135-136 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) Caribou was not the first to use the PD-1 knockout in an allogeneic CAR-T cell treatment; (2) the Gracell Trial had already demonstrated that knocking out the PD-1 protein was not linked to enhanced durability or performance; (3) Caribou lacked sufficient preclinical data to conclude that the PD-1 knockout improved the persistence of anti-tumor activity because its pre-clinical data did not go beyond 5.3 months; (4) there was no reasonable basis to state that CB-010 demonstrated dose dependency; and (5) six-month data from the ANTLER trial demonstrated that CB-010 lacked durability. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

***The July 13, 2023 Press Release and Earnings Call***

138. On July 13, 2023, the Company issued a press release, titled "Caribou Biosciences Reports Positive Clinical Data from Dose Escalation of CB-010 ANTLER Phase 1 Trial in r/r B-NHL." Despite the title's reference to "positive clinical data," the press release reported poor "long-term follow-up data from the dose escalation portion of the ongoing ANTLER Phase 1 trial," including that in three subjects

given 120 million cells, there was one non responder and two remissions lasting less than three months. Despite CB-010 being administered in higher doses, therefore, patients continued relapsing.

139. The same day, the Company hosted an earnings call with analyst's and investors. During the call, for the first time, investors were cautioned against accepting the Company's prior statements comparing its results to its competitors at face value because it "has not performed any head-to-head trials comparing any of these other CAR-T cell therapies with CB-010, and Caribou has only reviewed publicly available reports of those trials. As such, the results of these other clinical trials may not be comparable to clinical results for CB-010."

140. On this news, Caribou's stock price fell $1.84 per share, or 22.6%, from a close of $8.14 per share on July 13, 2023, to close at $6.30 per share on July 14, 2023.

***July 13, 2023 Preliminary Prospectus Supplement***

141. On July 13, 2023, after the markets closed, the Company filed the Preliminary Prospectus Supplement on Form 424B5 with the SEC. In discussing what the Company intended on using the proceeds from the July 2023 Offering for, the Preliminary Prospectus Supplement stated that "[w]e currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents, and marketable securities, to fund [inter alia] . . . preclinical development of our CB-020 product candidate[.]"

142. Additionally, the Preliminary Prospectus Supplement included a supposed warning that the Company "may" utilize those proceeds differently, however made comments that indicated a lower likelihood of that occurring, stating:

> Our management will have broad discretion in the application of the net proceeds, if any, from this offering and the amounts and timing of our actual expenditures will depend on numerous factors . . . . As of the date of this prospectus supplement, we cannot predict with certainty all of the particular uses for the net proceeds to be received upon the completion of this offering or the amounts that we will actually spend on the uses set forth above. The amounts and timing of our actual expenditures and the extent of our preclinical, clinical, and future development activities ***may*** vary significantly depending on numerous factors, including the progress of our development efforts, the status of and results from our ongoing and planned clinical trials, the timing of regulatory submissions and the outcome of regulatory review, our ability to take advantage of expedited programs or to obtain regulatory approval for product candidates, and the timing and costs associated with the manufacture and supply of our product candidates for clinical development or

> commercialization, as well as any collaborations that we may enter into with third parties for our product candidates and any unforeseen cash needs. Although ***we intend to spend the net proceeds of the offering as stated above, circumstances may*** arise when, for sound business reasons, a re-allocation of funds ***may*** be necessary or advisable.

***July 14, 2023 Finalized Prospectus Supplement***

143. The following day, the Company filed a finalized prospectus supplement on Form 424B5 with the SEC in connection with the July 2023 Offering (the "Finalized Prospectus Supplement").

144. The Finalized Prospectus Supplement repeated much of the same language as the Preliminary Prospectus Supplement regarding the purpose of the funds raised by the July 2023 Offering, stating that "[w]e currently intend to use the net proceeds from this offering, together with our existing cash, cash equivalents, and marketable securities, to fund [inter alia] . . . preclinical development of our CB020 product candidate."

145. In addition, the Finalized Prospectus Supplement included the same risk warning as was used in the Preliminary Prospectus Supplement.

***August 8, 2023 Press Release and Form 10-Q***

146. On August 8, 2023, the Company issued a press release announcing its financial and operational results for the second quarter of the 2023 Fiscal Year (the "Q2 2023 Earnings Release"). In discussing the data pertaining to CB-010 testing, the Q2 2023 Earnings Release quoted Defendant Haurwitz as stating:

> In 2023, we have advanced our programs to build value across the pipeline and position Caribou for continued momentum ahead . . . . For our lead program, ***we are excited by the positive CB-010 dose escalation data demonstrating response rates that rival those from the approved autologous CAR-T cell therapies***.

147. In further elaborating on the specifics of the CB-010 data, the Q2 2023 Earnings Release announced that "69% of patients (11 of 16) achieved a complete response (CR)"; that "44% of patients (7 of 16) had a CR at ≥6 months" with "24 months [being] the longest CR maintained to date"; and that "[f]or the subset of patients with large B cell lymphoma (LBCL) (N=10) . . . 70% (7 of 10) achieved a CR" and "50% (5 of 10) had a CR at ≥6 months" with "18 months [being] the longest CR maintained to date."

148. In discussing the Company's cash, cash equivalents, and marketable securities, the Q2 2023 Earnings Release announced that "Caribou had $292.5 million in cash, cash equivalents, and marketable securities as of June 30, 2023," which "does not include the approximately $134.6 million in net proceeds from the Company's underwritten public offering completed in the third quarter of 2023", and that "Caribou expects its cash, cash equivalents, marketable securities, and net proceeds from the recent public offering will be sufficient to fund its current operating plan into Q4 2025."

149. That same day, the Company filed its quarterly report for the second quarter of the 2023 Fiscal Year on Form 10-Q with the SEC (the "Q2 2023 10-Q"). The Q2 2023 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q2 2023 10-Q and that the Q2 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

150. In discussing the Company's cash, cash equivalents, and marketable securities, the Q2 2023 10-Q stated that "[o]ur management expects that existing cash, cash equivalents, and marketable securities of $292.5 million as of June 30, 2023, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our condensed consolidated financial statements."

***November 7, 2023 Press Release and Form 10-Q***

151. On November 7, 2023, the Company issued a press release announcing the financial and operational results for the third quarter of the 2023 Fiscal Year (the "Q3 2023 Earnings Release"). In discussing the Company's ability to fund its current research programs, the Q3 2023 Earnings Release quoted Defendant Haurwitz in stating:

> In 2023, we have advanced our programs to build value across the pipeline and position Caribou as a leader in the allogeneic CAR-T cell therapy space . . . . ***With two years of cash and continued financial discipline, we are well positioned to execute on our current programs*** and continue Caribou's momentum.

152. In providing an update on CB-010, the Q3 2023 Earnings Release stated that "Caribou continues to enroll second-line LBCL patients in the dose expansion portion of the ongoing ANTLER

Phase 1 clinical trial based on positive data from the dose escalation portion of the trial."

153. In discussing the Company's cash, cash equivalents, and marketable securities, the Q3 2023 Earnings Release revealed that "Caribou had $396.7 million in cash, cash equivalents, and marketable securities as of September 30, 2023," which "Caribou expects . . . will be sufficient to fund its current operating plan into Q4 2025."

154. That same day, the Company filed its quarterly report for the third quarter of the 2023 Fiscal Year on Form 10-Q with the SEC (the "Q3 2023 10-Q"). The Q3 2023 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q3 2023 10-Q and that the Q3 2023 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

155. In discussing the Company's cash, cash equivalents, and marketable securities, the Q3 2023 10-Q reported that "[o]ur management expects that existing cash, cash equivalents, and marketable securities of $396.7 million as of September 30, 2023, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our condensed consolidated financial statements."

***March 11, 2024 Press Release and Form 10-K***

156. On March 11, 2024, the Company issued a press release announcing its fourth quarter and year-end results for the 2023 Fiscal Year (the "FY 2023 Earnings Release"). In providing an update on CB-010, the FY 2023 Earnings Release stated that "[a]s previously reported, CB-010 demonstrated encouraging data from the dose escalation portion of the ANTLER Phase 1 clinical trial in 16 patients with [r/r B-NHL]" and that "***[d]ose escalation data showed CB-010 has the potential to rival the efficacy and safety profile of approved autologous CAR-T cell therapies***."

157. In discussing the Company's cash, cash equivalents, and marketable securities, the FY 2023 Earnings Release announced that "Caribou had $372.4 million in cash, cash equivalents, and marketable securities as of December 31, 2023," which "Caribou expects . . . will be sufficient to fund its

current operating plan into Q1 2026."

158. That same day, the Company filed its annual report on Form 10-K for the 2023 Fiscal Year (the "2023 10-K"). The 2023 10-K was signed by Defendants Haurwitz, O'Byrne, Braunstein, Guggenhime, Richardson-Heron, Johnson, Sacks, Whiting, and Zheng and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the 2023 10-K and that the 2023 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

159. In discussing CB-010, the 2023 10-K announced that "[s]afety results from patients at all three dose levels [in the ANTLER Phase 1 clinical trial] showed CB-010 was generally well-tolerated ***with adverse events ('AEs') consistent with autologous . . . anti-CD19 CAR-T cell therapies***."

160. In discussing the state of the Company's cash, cash equivalents, and market securities and the expectations for how long they will last the Company, the 2023 10-K stated that there was an expectation "that [Caribou's] existing cash, cash equivalents, and marketable securities of $372.4 million as of December 31, 2023, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our consolidated financial statements."

***April 25, 2024 Proxy Statement***

161. On April 25, 2024, the Company filed the 2024 Proxy Statement with the SEC. Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

162. The 2024 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) re-elect Defendants Haurwitz, Richardson-Heron, and Sacks to the Board for a three-year term; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

163. With respect to the Company's Code of Conduct, the 2024 Proxy Statement stated:

> We have adopted a written Code of Business Conduct, Scientific and Data Integrity, and Ethics ("Code of Conduct") that applies to all of our employees, consultants, contractors,

> and directors. A current copy of the Code of Conduct is available on the Corporate Governance section of our website at https://investor.cariboubio.com. The audit committee is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for our executive officers and directors. We expect that any amendments to the Code of Conduct, or any waivers of its requirements with respect to our executive officers and directors, will be disclosed on our website at the address indicated above. Our website and the information contained therein or connected thereto shall not be deemed to be incorporated into this proxy statement. We have included our website address as an inactive textual reference only. We will provide to any person, without charge, a copy of the Code of Conduct. Any such request should be directed to Caribou Biosciences, Inc., 2929 7th Street, Suite 105, Berkeley, CA 94710, Attn: Chief Legal Officer and Corporate Secretary, telephone: 510-982-6030.

164. Regarding the "Role of our Board in Risk Oversight Process," the 2024 Proxy Statement stated the following:

> Although our officers are responsible for the day-to-day management of risks, our Board has broad oversight responsibility for our Company's risk management programs. Our officers are charged with identifying material risks that we face; implementing strategies to address specific material risk exposures; evaluating risk and risk management with respect to business decision-making throughout our Company; and efficiently and promptly transmitting relevant risk-related information to our Board or appropriate committee, so as to enable them to conduct appropriate risk management oversight.
>
> Our Board performs an active role, as a whole and also at the committee level, in overseeing the management of our risks. Our Board is responsible for general oversight of risks and regular review of information regarding our risks, including credit risks, liquidity risks, and operational risks. The audit committee is responsible for overseeing the management of our major financial risk exposures, including risks relating to accounting matters and financial reporting, legal and compliance risks, and cyber security risks. As part of this oversight, the audit committee receives regular reports from management on such risks at its regularly scheduled meetings, including reports not less than twice per year relating to data privacy and cybersecurity and the actions management has taken to limit, monitor, or control such exposures. The compensation committee is responsible for overseeing the management of risks relating to our executive compensation plans and arrangements. The NCG committee is responsible for overseeing the management of risks associated with the independence of our Board and potential conflicts of interest. Although each committee is responsible for evaluating certain risks and overseeing the management of such risks, our entire Board is regularly informed through discussions from committee members about such risks.

165. Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Individual Defendants had overstated the safety, efficacy, and durability of CB-010 as compared to its approved autologous CAR-T cell counterpart when treating patients r/r B-NHL and/or

LBCL; (2) the Individual Defendants overstated CB-010's overall clinical results and commercial prospects; (3) the company was at a serious risk of running out of cash, liquidity, and/or other capital to fund its current operations, including preclinical research associated with the allogeneic CAR-NK platform; and (4) as a result of the foregoing, there would likely be a negative impact on the Company's business and operations. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

166. The 2024 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct and the Audit Committee Charter were not followed, as evidenced by the Individual Defendants: (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

167. As a result of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Haurwitz, Richardson-Heron, and Sacks to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

***May 7, 2024 Press Release and Form 10-Q***

168. On May 7, 2024, the Company issued a press release announcing its financial and operational results from the first quarter of the 2024 Fiscal Year (the "Q1 2024 Earnings Release"). In discussing the Company's cash, cash equivalents, and marketable securities, the Q1 2024 Earnings Release announced that "Caribou had $345.9 million in cash, cash equivalents, and marketable securities as of March 31, 2024," which "Caribou expects . . . will be sufficient to fund its current operating plan into Q1 2026."

169. That same day, the Company filed its quarterly report for the first quarter of the 2024 Fiscal

Year on Form 10-Q with the SEC (the "Q1 2024 10-Q"). The Q1 2024 10-Q was signed by Defendants Haurwitz and O'Byrne and attached SOX certifications signed by Defendants Haurwitz and O'Byrne attesting to the accuracy of the Q1 2024 10-Q and that the Q1 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report.

170. In discussing expectations surrounding the Company's cash, cash equivalents, and marketable securities, the Q1 2024 10-Q stated that "[o]ur management expects that existing cash, cash equivalents, and marketable securities of $345.9 million as of March 31, 2024, will be sufficient to fund our current operating plan for at least the next 12 months from the date of issuance of our unaudited condensed consolidated financial statements."

***June 2, 2024 Press Release***

171. On June 2, 2024, the Company issued a press release announcing that it had recently "presented updated clinical data from the ongoing ANTLER Phase 1 trial" at the 2024 American Society of Clinical Oncology Annual Meeting. According to the press release, the data supposedly "indicate[d that] a single dose of ***CB-010 . . . has the potential to rival the safety, efficacy, and durability of approved autologous CAR-T cell therapies***."

172. The statements in ¶¶ 141-160, 168-171 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) the Individual Defendants had overstated the safety, efficacy, and durability of CB-010 as compared to its approved autologous CAR-T cell counterpart when treating patients r/r B-NHL and/or LBCL; (2) the Individual Defendants overstated CB-010's overall clinical results and commercial prospects; (3) the company was at a serious risk of running out of cash, liquidity, and/or other capital to fund its current operations, including preclinical research associated with the allogeneic CAR-NK platform; and (4) as a result of the foregoing, there would likely be a negative impact on the Company's business and operations. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH FULLY EMERGES

***June 3, 2024 Evercore Report***

173. On June 3, 2024, before the market opened, a report was issued by Evercore regarding the Company's updated clinical data from the ANTLER Phase 1 trial (the "Evercore Report"). The Evercore Report revealed that Evercore was choosing to downgrade the Company's stock to "in line" and dropped the price target on the Company from $13.00 all the way down to $3.00, as Evercore was "not yet convinced" that the Company's therapy "will be competitive and wait on the sidelines until data in 1H 2025." On the topic, the Evercore Report stated, *inter alia*:

> **[Caribou] may have unlocked the key to allogenic CAR-T. But we are not yet convinced that it will be competitive and wait on the sidelines until data in 1H25 [first half of 2025]. Reducing our rating to In Line and PT [price target] to $3.**
>
> At ASCO this weekend, [Caribou] presented details of the HLA subgroup analysis of the P1 [Phase 1] ANTLER study for its allogenic CD19 CAR-T, CB-010. The idea was to move it closer to its autologous counterparts. The analysis showed patients with HLA match of at least 4 antigens do better than those with lesser or no HLA match. **But is it good enough? ORR [overall response rate] looks strong, but CR [complete response] and PFS [progression-free survival] still fall behind autologous CAR-T[.]**

(Emphasis in original).

174. The Evercore Report went on to discuss CB-010's efficacy and durability as compared to the respective autologous counterpart, stating:

> In this subset of 11 LBCL patients treated with CB-010 in the P1 ANTLER study with at least 4 (max HLA match was 6), ORR was 91%, CR was 36% and 6 month PFS was 53% (suggests 6 months is close to the median (50%) PFS level).
>
> This compares relatively well to autologous CAR-T which achieved 83-86% ORR. ***But CR for autologous counterparts is in the 65-66% range and median PFS is beyond 14 months***.
>
> * * *
>
> ***Overall, efficacy of CB-010 in 2L [second-line] LBCL is not competitive vs autologous CAR-T with lower response rate and much shorter PFS.***

175. In discussing the risks associated with CB-010's safety and competition, the Evercore Report stated:

> **Enhanced lymphodepletion may pose safety risk.** The CB-010 trial uses an enhanced lymphodepletion (LD) regimen that is expected to create a larger window for optimal engraftment of the infused cells. However, it also comes with the potential risk for infection and neurotoxicity. Another allogenic cell therapy company, Precision Bio used an enhanced LD protocol in its allogeneic CAR-T trial. Despite encouraging efficacy, the regimen led to multiple deaths and prompted the company to ameliorate the regimen to improve safety . . . . Bears worry that the current safety profile is warranted by careful patient selection in the clinical setting and the enhanced LD may led to serious AE [adverse events] e.g., deaths in broader patient population. Also, bears wonder how much of the efficacy/durability may be related to the aggressive LD regimen. It's worth noting that this regimen is not used for other [Caribou] programs.
>
> **Lead candidates in crowded space**. CD19 and BCMA are highly competitive fields for cell therapies. Besides FDA approved CAR-Ts and bispecifics, there are numerous autologous and allogeneic CAR-T programs in development.
>
> **Solid tumor is a competitive space**. Immunotherapies for solid tumors is a crowded space. We counted 46 cellular and mRNA therapies in clinical development for treatment of solid tumor, including CAR-T, TCR, NK, and TIL., all early stage.

176. On this news, the price of Caribou's stock fell $0.735 per share, or approximately 25.5%, from a close of $2.88 per share on June 2, 2024, to close at $2.145 per share on June 3, 2024.

***July 16, 2024 Form 8-K***

177. On July 16, 2024, after the markets closed, the truth fully emerged when the Company filed the Discontinuation 8-K with the SEC.

178. The Discontinuation 8-K revealed that the Company was halting all preclinical research activities regarding its CAR-NK platform and reducing its workforce by approximately 12%, stating:

> On July 16, 2024, the Company discontinued preclinical research activities associated with its allogeneic CAR-NK platform and reduced its workforce by 21 positions, or approximately 12%. The Company is undertaking this reduction to extend its cash runway and focus resources on its allogeneic CAR-T cell therapy platform and on rapidly advancing four oncology and autoimmune disease clinical programs through multiple milestones expected in 2024 and 2025. The Company expects to substantially complete the reduction by the end of the third quarter of 2024.
>
> * * *
>
> In connection with the workforce reduction, the Company currently estimates it will incur approximately $0.5 million to $1.0 million in costs, consisting primarily of cash severance costs, benefits, and transition support services for impacted employees, which the Company expects to recognize in the third quarter of 2024.

> The estimates of costs and expenses that the Company expects to incur in connection with the CAR-NK platform discontinuation and workforce reduction are subject to a number of assumptions, and actual results may differ materially. The Company may also incur costs not currently contemplated due to events that may occur as a result of, or that are associated with, this decision.

179. On this news, the price of Caribou's stock fell $0.09 per share, or approximately 3.3%, from a close of $2.73 per share on July 16, 2024, to close at $2.64 per share on July 17, 2024.

## SUBSEQUENT DEVELOPMENTS

180. On September 3, 2024, the Company filed a Form 8-K with the SEC announcing that Defendant O'Byrne would be resigning from his position as CFO, effective on September 27, 2024.

## DAMAGES TO CARIBOU

181. As a direct and proximate result of the Individual Defendants' conduct, Caribou has lost and will continue to lose and expend many millions of dollars.

182. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.[4]

183. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

184. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

185. Additionally, these expenditures include, but are not limited to, unjust compensation,

---

[4] On June 28, 2024, plaintiffs in the Securities Class Action filed a notice of unopposed for preliminary approval of settlement in that action in exchange for a cash payment of $3,900,000, based on a final recommendation of the mediator, the Honorable S. James Otero (Ret.). On February 18, 2025, United States District Judge Rita F. Lin issued an order and final judgment approving settlement of the Securities Class Action.

benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

186. As a direct and proximate result of the Individual Defendants' conduct, Caribou has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

187. Plaintiffs bring this action derivatively and for the benefit of Caribou to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Caribou, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Haurwitz and O'Byrne.

188. Caribou is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

189. Plaintiffs are, and have been at all relevant times, shareholders of Caribou. Plaintiffs will adequately and fairly represent the interests of Caribou in enforcing and prosecuting its rights, and, to that end, have retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

190. Plaintiffs incorporate by reference and reallege each and every allegation stated above as if fully set forth herein.

191. A pre-suit demand on the Board is futile and, therefore, excused. At the time of filing this Amended Consolidated Complaint, Caribou's Board consisted of the following eight individuals: Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng (the "Director-Defendants"). As such, Plaintiffs need only to allege demand futility as to four of the eight Director-Defendants.

192. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged

in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact. The Director-Defendants, as alleged herein, were aware or should have been aware that the statements they issued, or caused to be issued on the Company's behalf, were materially false and misleading, but took no steps a good faith effort to prevent or remedy such misstatements. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

193. Each of the Director-Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

194. Each of the Director-Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

195. Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

196. Moreover, all of the Director-Defendants solicited the false and misleading 2022, 2023, and 2024 Proxy Statements calling for shareholder votes to, *inter alia*, re-elect the Director-Defendants to the Board for three-year terms, thereby allowing them to continue breaching their fiduciary duties to the Company.

197. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Caribou to issue materially false and misleading statements. Specifically, the Director-Defendants caused Caribou to issue false and misleading statements which were intended to make Caribou appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested,

and demand upon them is futile, and thus excused.

198. Additional reasons that demand on Defendant Haurwitz is futile follow. Defendant Haurwitz has served as the President, CEO, and a Company director since October 2011. The Company provides Defendant Haurwitz with her principal occupation, for which she receives handsome compensation. Thus, as the Company admits, she is a non-independent director. As the Company's highest officer during the Relevant Period, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein, and personally made many of the false and misleading statements herself. As the CEO of the Company, Defendant Haurwitz also signed the false and misleading annual and quarterly reports filed with the SEC, as well as the respective SOX certifications.[5] Moreover, Defendant Haurwitz was named as a defendant in the Securities Class Action. For these reasons, Defendant Haurwitz breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

199. Additional reasons that demand on Defendant Braunstein is futile follow. Defendant Braunstein has served as a Company director since June 2021. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Braunstein has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a Company director, Defendant Braunstein also signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. Moreover, Defendant Braunstein was named as a defendant in the Securities Class Action. For these reasons too, Defendant Braunstein breached his fiduciary duties, faces a substantial likelihood of liability,

[5] Specifically, these were the Q2 2021 10-Q, Q3 2021 10-Q, 2021 10-K, Q1 2022 10-Q, Q2 2022 10-Q, Q3 2022 10-Q, 2022 10-K, Q1 2023 10-Q, Q2 2023 10-Q, Q3 2023 10-Q, 2023 10-K, and Q1 2024 10-Q.

is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

200. Additional reasons that demand on Defendant Guggenhime is futile follow. Defendant Guggenhime has served as a Company director and the Chair of the Board since April 2021. He also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Guggenhime has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a Company director, Defendant Guggenhime also signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. Moreover, Defendant Guggenhime was named as a defendant in the Securities Class Action. For these reasons too, Defendant Guggenhime breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

201. Additional reasons that demand on Defendant Johnson is futile follow. Defendant Johnson has served as a Company director since May 2022. He also serves as a member of the Audit Committee. Defendant Johnson has received and continues to receive handsome compensation for his role as a director. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. As a Company director, Defendant Johnson also signed the false and misleading 2022 10-K and 2023 10-K. For these reasons too, Defendant Johnson breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and therefore, excused.

202. Additional reasons that demand on Defendant Richardson-Heron is futile follow. Defendant Richardson-Heron has served as a Company director since November 2021. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Richardson-Heron has received and continues to receive handsome compensation for her role as a director. As a trusted Company

director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a Company director, Defendant Richardson-Heron also signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons too, Defendant Richardson-Heron breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

203. Additional reasons that demand on Defendant Sacks is futile follow. Defendant Sacks has served as a Company director since May 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Science and Technology Committee. Defendant Sacks has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a Company director, Defendant Sacks also signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. Moreover, Defendant Sacks was named as a defendant in the Securities Class Action. For these reasons too, Defendant Sacks breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

204. Additional reasons that demand on Defendant Whiting is futile follow. Defendant Whiting has served as a Company director since August 2021. She also serves as the Chair of the Science and Technology Committee and as a member of the Compensation Committee. Defendant Whiting has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a Company director, Defendant Whiting also signed the false and misleading 2021 10-K, 2022 10-K, and

2023 10-K. For these reasons too, Defendant Whiting breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

205. Additional reasons that demand on Defendant Zheng is futile follow. Defendant Zheng has served as a Company director since September 2021. She also serves as a member of the Nominating and Corporate Governance Committee and the Science and Technology Committee. Defendant Zheng has received and continues to receive handsome compensation for her role as a director. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. As a Company director, Defendant Zheng also signed the false and misleading 2021 10-K, 2022 10-K, and 2023 10-K. For these reasons too, Defendant Zheng breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and therefore, excused.

206. Additional reasons that demand on the Board is futile follow.

207. Defendants Guggenhime (as Chair), Braunstein, and Johnson (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

208. Defendants Whiting (as Chair), Sacks, and Zheng (collectively, the "Science and Technology Committee Defendants") served as members of the Science and Technology Committee at all relevant times. As such, they were responsible for providing guidance on the Company's clinical trials and overseeing the Company's scientific research and development. During the Relevant Period, they violated the Science and Technology Committee Charter by failing to properly assess the Company's research pipeline and provide appropriate guidance as to the Company's clinical trials, specifically the progress of the ANTLER Trial and the durability of CB-010, leading to the Company engaging in the dissemination of materially false and misleading statements to the public. Thus, the Science and Technology Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

209. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

210. Caribou has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Caribou any part of the damages Caribou suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

211. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations

of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

212. The acts complained of herein constitute violations of fiduciary duties owed by Caribou's officers and directors, and these acts are incapable of ratification.

213. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Caribou. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Caribou, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

214. If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Caribou to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

215. Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

/ / /

/ / /

## CLAIMS FOR RELIEF

## COUNT I

### Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act

216. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

217. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

218. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

219. Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng caused the 2022 Proxy Statement and 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Caribou was not the first to use the PD-1 knockout in an allogeneic CAR-T cell treatment; (2) the Gracell Trial had already demonstrated that knocking out the PD-1 protein was not linked to enhanced durability or performance; (3) Caribou lacked sufficient preclinical data to conclude that the PD-1 knockout improved the persistence of anti-tumor activity because its pre-clinical data did not go beyond 5.3 months; (4) there was no reasonable basis to state that CB-010 demonstrated dose dependency; and (5) six-month data from the ANTLER trial demonstrated that CB-010 lacked durability. As a result of the foregoing, the Company's statements about its business,

operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

220. Under the direction and watch of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng, the 2022 Proxy Statement and 2023 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement and 2023 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

221. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2022 Proxy Statement and 2023 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2022 Proxy Statement and 2023 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

222. As a result of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Braunstein and Zheng to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

223. As a result of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) re-elect Defendants Guggenhime, Johnson, and Whiting to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; and (2)

ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

224. Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) the Individual Defendants had overstated the safety, efficacy, and durability of CB-010 as compared to its approved autologous CAR-T cell counterpart when treating patients r/r B-NHL and/or LBCL; (2) the Individual Defendants overstated CB-010's overall clinical results and commercial prospects; (3) the company was at a serious risk of running out of cash, liquidity, and/or other capital to fund its current operations, including preclinical research associated with the allogeneic CAR-NK platform; and (4) as a result of the foregoing, there would likely be a negative impact on the Company's business and operations. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

225. Under the direction and watch of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng, the 2024 Proxy Statement also failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's description of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

226. In the exercise of reasonable care, the Individual Defendants should have known that, by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs in voting on the matters set forth for shareholder determination in the 2024 Proxy Statement, including, but not limited to, the reelection of the Company's directors.

227. As a result of Defendants Haurwitz, Braunstein, Guggenhime, Johnson, Richardson-Heron, Sacks, Whiting, and Zheng causing the 2024 Proxy Statement to be false and misleading, Company

shareholders voted, *inter alia*, to: (1) re-elect Defendants Haurwitz, Richardson-Heron, and Sacks to the Board for a three-year term, allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

228. The Company was damaged as a result of Defendants Haurwitz's, Braunstein's, Guggenhime's, Johnson's, Richardson-Heron's, Sacks's, Whiting's, and Zheng's material misrepresentations and omissions in the 2022, 2023, and 2024 Proxy Statement.

229. Plaintiffs, on behalf of Caribou, have no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Breach of Fiduciary Duties**

230. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

231. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Caribou's business and affairs.

232. Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

233. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Caribou.

234. In breach of their fiduciary duties owed to Caribou, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: Caribou was not the first to use the PD-1 knockout in an allogeneic CAR-T cell treatment; (2) the Gracell Trial had already demonstrated that knocking out the PD-1 protein was not linked to enhanced durability or performance; (3) Caribou lacked sufficient preclinical data to conclude that the PD-1 knockout improved the persistence of anti-tumor activity because its pre-clinical data did not go beyond 5.3 months; (4) there was no reasonable basis to state that

CB-010 demonstrated dose dependency; and (5) six-month data from the ANTLER trial demonstrated that CB-010 lacked durability. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

235. In further breach of their fiduciary duties owed to Caribou, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Individual Defendants had overstated the safety, efficacy, and durability of CB-010 as compared to its approved autologous CAR-T cell counterpart when treating patients r/r B-NHL and/or LBCL; (2) the Individual Defendants overstated CB-010's overall clinical results and commercial prospects; (3) the company was at a serious risk of running out of cash, liquidity, and/or other capital to fund its current operations, including preclinical research associated with the allogeneic CAR-NK platform; and (4) as a result of the foregoing, there would likely be a negative impact on the Company's business and operations. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

236. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable to the Company for breaching their fiduciary duties.

237. Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

238. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly issue materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or

recklessly and for the purpose and effect of artificially inflating the price of Caribou's securities.

239. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Caribou's securities and disguising insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

240. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

241. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Caribou has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

242. Plaintiffs, on behalf of Caribou, have no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

243. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

244. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Caribou.

245. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Caribou that was tied to the performance or artificially inflated valuation of Caribou, or received compensation or other payments that were unjust

in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

246. Plaintiffs, as shareholders and representatives of Caribou, seek restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

247. Plaintiffs, on behalf of Caribou, have no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Abuse of Control

248. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

249. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Caribou, for which they are legally responsible.

250. As a direct and proximate result of the Individual Defendants' abuse of control, Caribou has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

251. Plaintiffs, on behalf of Caribou, have no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Gross Mismanagement

252. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

253. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Caribou in a manner consistent with the operations of a publicly held corporation.

254. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Caribou has sustained and will continue to sustain significant damages.

255. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

256. Plaintiffs, on behalf of Caribou, have no adequate remedy at law.

**COUNT VI**

**Against the Individual Defendants for Waste of Corporate Assets**

257. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

258. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

259. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Caribou to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

260. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

261. Plaintiffs, on behalf of Caribou, have no adequate remedy at law.

**COUNT VII**

**Against Defendants Haurwitz and O'Byrne for Contribution Under Sections 10(b) and 21D of the Exchange Act**

262. Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

263. Caribou and Defendants Haurwitz and O'Byrne were named as defendants in the Securities Class Action, which asserted claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and, along with Defendants Braunstein, Guggenhime, and Sacks, asserted

claims under the federal securities laws for violations of Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"). These Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company resulted in the Company's liability in connection with settlement of the Securities Class Action, including the cash payment of $3.9 million to settle that action.

264. Defendants Haurwitz and O'Byrne, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

265. Accordingly, Defendants Haurwitz and O'Byrne are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

266. As such, Caribou is entitled to receive all appropriate contribution or indemnification from Defendants Haurwitz and O'Byrne.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiffs may maintain this action on behalf of Caribou, and that Plaintiffs are adequate representatives of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Caribou;

(c) Determining and awarding to Caribou the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Caribou and the Individual Defendants to take all necessary actions to reform and improve Caribou's corporate governance and internal procedures to comply with applicable laws and to protect Caribou and its shareholders from a repeat of the damaging events described herein,

including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;
2. a provision to permit the shareholders of Caribou to nominate at least four candidates for election to the Board;
3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e) Awarding Caribou restitution from Individual Defendants, and each of them;

(f) Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

Dated: July 7, 2025

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

*/s/ Alex J. Tramontano*
ALEX J. TRAMONTANO

Betsy C. Manifold
Rachele R. Byrd
Alex J. Tramontano
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: (619) 239-4599
Facsimile: (619) 234-4599
Email: manifold@whafh.com
byrd@whafh.com
tramontano@whafh.com

*Counsel for Plaintiff Jonathan Allen*

**RIGRODSKY LAW, P.A.**
Timothy J. MacFall
Gina M. Serra
825 East Gate Boulevard, Suite 300
Garden City, NY 11530
Telephone: (516) 683-3516
Email: tjm@rl-legal.com
gms@rl-legal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Co-Lead Counsel for Plaintiffs*

# VERIFICATION

I, Alan Moisio, am a plaintiff in the within action. I have reviewed the allegations made in this Amended Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 2__ day of July, 2025.

DocuSigned by:

B7E669230A7141C...

Alan Moisio

**VERIFICATION**

I, Jonathan Allen, am a plaintiff in the within action. I have reviewed the allegations made in this Verified Amended Consolidated Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 3__ day of July, 2025.

Signed by:

3BE3CAE3F15D4DE...

Jonathan Allen